IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ASHLEY FURNITURE INDUSTRIES, LLC,

Plaintiff,

v.

PERFICIENT, INC.,

Defendant.

OPINION and ORDER

21-cv-622-jdp

---

Plaintiff Ashley Furniture Industries, LLC hired defendant Perficient, Inc. to develop software for managing Ashley's orders. After nearly four years and more than $9 million in invoices, Ashley says that Perficient failed to develop a product that worked, leaving Ashley worse off than when it started. Perficient doesn't deny that there were problems, but it says that they were caused by Ashley changing its mind about what it wanted and not heeding Perficient's advice. Both parties are suing each other for breach of contract.

Perficient moves for summary judgment on Ashley's claim and Perficient's counterclaim. Dkt. 52. For the reasons explained below, the court will grant the motion in part and deny it in part on Ashley's claim and deny the motion on Perficient's counterclaim.

BACKGROUND

The parties submitted more than 300 pages of proposed findings of fact and responses to the other party's proposed findings. *See* Dkt. 111 (92-page reply to Ashley's response to Perficient's proposed findings of fact) and Dkt. 112 (231-page response to Ashley's proposed findings of fact). Many of the proposed findings, responses, and replies did not comply with the court's summary judgment procedures and were not helpful to the court. For example,

Ashley disregarded the court's rule that the nonmoving party's additional proposed findings of fact should supplement the moving party's proposed findings of fact with facts that that the moving party omitted, not restate or dispute the moving party's facts. "Motions for Summary Judgment," Attachment to Dkt. 15, § II.B. This leads to unnecessary repetition and additional length.

Other problems from the proposed findings submitted by both sides included compound facts,[1] vague and conclusory assertions followed by lengthy string citations,[2] slanted characterizations that were not directly supported by the evidence,[3] legal arguments couched as facts,[4] numerous proposed findings devoted to the content of documents and expert opinions,[5] summaries of the other parties' contentions,[6] and new facts being proposed in

---

[1] *See, e.g.*, Perficient's Proposed Findings of Fact, Dkt. 53, ¶¶ 31, 49, 77; Ashley's Supplemental Proposed Findings of Fact, Dkt. 88, ¶¶ 130, 147, 151.

[2] *See, e.g.*, Perficient's Proposed Findings of Fact, Dkt. 53, ¶¶ 31, 61, 62, 63; Ashley's Supplemental Proposed Findings of Fact, Dkt. 88, ¶¶ 7, 100, 103, 107, 116, 127, 159, 160, 224, 238, 274, 288, 289, 302, 304, 321.

[3] *See, e.g.*, Ashley's Supplemental Proposed Findings of Fact ¶¶ 12, 86, 90, 105, 106, 121, 125, 129, 131, 133, 147, 149, 156, 165, 202, 204, 207, 209, 219, 222, 234, 235, 237, 239, 248, 257, 259, 260, 269, 272, 273, 275, 277, 278, 282, 284, 319,

[4] *See, e.g.*, Perficient's Proposed Findings of Fact, Dkt. 53, ¶¶ 7, 31, 39, 46, 50, 78; Ashley's Supplemental Proposed Findings of Fact, ¶¶ 9, 14, 89, 93, 116, 127, 130, 135–36, 138–39, 141, 148, 152, 168, 170, 171, 184, 186, 188, 190, 192, 254, 271, 280, 283, 290, 293, 306, 322, 325, 326.

[5] *See, e.g.*, Ashley's Supplemental Proposed Findings of Fact, Dkt. 88, ¶¶ 35–42, 88, 91–92, 134, 154–55, 167, 169, 172–81, 185, 187, 189, 191, 294–300, 312–16.

[6] *See, e.g.*, Perficient's Proposed Findings of Fact, Dkt. 53, ¶¶ 22–29, 32–33, 36, 38, 40–41, 44–45, 47–48, 50, 55, 65–67, 69–72; Ashley's Supplemental Proposed Findings of Fact ¶¶ 276, 301.

responses and replies.[7] Proposed findings and responses of that sort were unhelpful and violated multiple court rules.[8]

The purpose of proposed findings of fact is to assist the court with identifying disputed and undisputed facts. *Id.*, § I.B.1. For this reason, it is important that parties propose discrete facts that are directly supported by specific evidence and are free from argument or interpretation. It is not helpful to the court when parties treat their proposed findings of fact as just another brief to argue their case. Doing so guarantees the result here, which is lengthy documents that contain few real facts and many disputes, some of which spanned more than five pages.

The court disregarded proposed findings of fact that did not comply with court rules, including all those cited by the court above. This left relatively few facts for the court to consider, so the court provides only a general background of the facts here. The parties will have to provide a clearer factual presentation at trial.

Ashley manufactures home furniture. Perficient is a digital consulting firm. In 2017, Ashley decided to upgrade its software system for managing orders. In July 2017, the parties entered a "Master Professional Services Agreement," which governed the parties' relationship.

---

[7] *See, e.g.,* Perficient's Response to Ashley's Additional Proposed Findings of Fact, Dkt. 112, ¶ 184, Ashley's Response to Perficient's Proposed Findings of Fact, Dkt. 82, ¶ 61; Perficient's Reply to Ashley's Response to Perficient's Proposed Findings of Fact, Dkt. 111, ¶¶ 9, 13, 18, 61.

[8] *See* "Motions for Summary Judgment," Attachment to Dkt. 15, § I.B.3 (a proposed finding of fact should be "limited as nearly as practical to a single factual proposition"); *id.*, § I.B.5 ("Do not propose multiple facts restating the individual provisions of the document. Do not propose facts stating your argument about the meaning of the document."); *id.*, § I.B.6 ("Do not propose facts reciting expert opinions or parties' arguments."); *id.*, § II.D.2 ("All responses should be succinctly stated."), *id.*, § II.D.3 ("[D]o not respond to proposed facts with additional facts that are not directly responsive to the proposed fact.").

In accordance with the agreement, the parties entered into a series of "Statements of Work," or SOWs, for the development of an order management system. Between May 2019 and May 2021, the parties also entered into five "Change Orders" that modified SOW 7.  The last Change Order extended the deadline for Perficient to complete performance to September 2021.

A threshold determination that Ashley needed to make was whether to "build or buy," that is, whether Ashley should create its own order management system or customize existing software. After Perficient recommended that Ashley "buy," the parties agreed to use IBM Sterling software as the foundation for Ashley's order management system.

There were numerous delays in modifying Sterling to fit Ashley's needs. Ashley says that the problems were the result of an inherent incompatibility between Sterling and Ashley's business requirements and that Perficient either knew or should have known Sterling wouldn't work for Ashley. Perficient says that the problems were caused by Ashley's constantly changing requirements and refusals to take Perficient's advice.

In both 2020 and 2021, Ashley asked IBM to conduct assessments of the software that Perficient had developed for Ashley. In September 2020, IBM issued a report that identified multiple problems with the software that it identified as "critical," and it made recommendations to address the problems. IBM's 2020 report led to Change Order No. 5 to SOW 7 in 2021. IBM issued a second report in June 2021, in which it concluded that the "initial application design . . . caused [] massive slowdowns" in performance and that Sterling's mechanism for reallocation "can't be employed for Ashley." Dkt. 89-45, §§ 1 and 2.1.

After receiving the June 2021 report, Ashley wrote a letter to Perficient in which it complained to Perficient about the numerous problems with the software. Ashley asked to meet

with Perficient "to discuss an appropriate resolution of this matter, which will include reimbursement of fees for unacceptable work and Perficient's redoubled best efforts to assist us in rescuing this implementation." Perficient did not respond in writing to Ashley's letter and the parties did not meet again.

In September 2021, Perficient sent Ashley a letter asking for payment of outstanding invoices totaling approximately $1 million for work on SOW 7. Ashley has not paid the invoices.

The court may exercise jurisdiction under 28 U.S.C. § 1332 because Ashley is a citizen of Wisconsin, Perficient is a citizen of Delaware and Missouri, and Ashley is seeking well over $75,000 in damages. Ashley is a limited liability company, and its sole member is Ashley Holdings, Inc. Wisconsin is the location of Ashley Holdings' principal place of business and its state of incorporation.[9] Perficient is incorporated in Delaware, and its principal place of business is in Missouri.

The court will provide more facts as they become relevant to the analysis.

ANALYSIS

Ashley contends that Perficient breached their agreement by both recommending in bad faith that Ashley use Sterling to customize and order management system and by providing defective work product. Perficient contends that Ashley breached their agreement by failing to pay all of Perficient's invoices.

---

[9] As requested by the court, Dkt. 128, the parties submitted a stipulation that established Ashley's citizenship. *See* Dkt. 129.

5

Perficient seeks summary judgment on both claims as well as some damages issues. On a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The court draws all reasonable inferences in favor of the nonmoving party, *Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023), which in this case is Ashley.

The parties agree that their dispute is governed by New York law under the master agreement, but neither side cites much New York law in their briefs for anything other than general contract principles. The court agrees that Perficient's motion can be resolved based primarily on the plain language of the parties' agreements, which is controlling under New York law. *See W.W.W. Associates v Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

## A. Ashley's breach-of-contract claim

Ashley identifies the following alleged breaches in its summary judgment brief:

1) When assessing whether Ashley should create its own order management system or customize existing software (what the parties refer to as "build or buy"), Perficient did not follow a "platform agnostic" approach, in violation of SOW 4.

2) Perficient failed to follow industry standards when implementing SOW 5 and SOW 7.

3) Perficient failed to conduct proper testing and provide Ashley with a working order management system, in violation of SOW 7.

Perficient discusses other alleged breaches in its opening brief, but Ashley's arguments are limited to the breaches above. The court will construe Ashley's silence to mean that it has abandoned any claims about other alleged breaches.

### 1. SOW 4

A threshold determination that Ashley needed to make was whether to "build or buy," that is, whether to create its own order management system or customize existing software.

6

SOW 4 directed Perficient to "recommend the best approach." Dkt. 54-5, at 2. Under SOW 4, "Perficient's point of view will be platform agnostic." *Id.*

Ashley doesn't contend that contend that "building" was the wrong choice. Rather, Ashley contends that Perficient breached SOW 4 by "recommending IBM Sterling" while "knowing it was not the appropriate software solution." Dkt. 83, at 48. Ashley's theory is that Perficient had financial incentives from IBM to push Sterling on Ashley, so Perficient never considered any other option for Ashley.

This claim fails because Ashley hasn't adduced evidence that Perficient *did* recommend Sterling as part of its work on SOW 4 or that its recommendation to "buy" was otherwise not "platform agnostic." Ashley relies on the testimony of two Perficient employees, Dkt. 112, ¶ 128, but the cited testimony isn't helpful for Ashley. Steve Gatto, Perficient's lead salesperson on the project, testified that *Ashley* asked Perficient "to go back to IBM and give them a perspective on what an order management project would look like based on IBM Sterling." Dkt. 59, at 173:16–21 and 175:19–24. Pawan Gupta, Perficient's practice director, similarly testified that "Ashley . . . expressed interest on what an IBM Sterling solution may . . . look like for them." Dkt. 64, at 183:13–23.

It appears to be undisputed that Perficient did persuade Ashley to "buy" rather than "build." Both sides refer to a spreadsheet that they call the "Business Value Assessment." Dkt. 54-21 and Dkt. 96-4. Neither side cites testimony in their proposed findings of fact that explains what the spreadsheet means, but the parties agree that it represents estimates by Perficient of potential cost savings to Ashley if Ashley chose to buy rather than build. Dkt. 112, ¶ 95. A June 2018 slide presentation also includes a section called "Building vs Buying" in which Perficient provided a "capability comparison" between "Ashley" and "Enterprise

System," and that comparison is favorable for the "Enterprise System." Dkt. 89-44, at 33–35. But a recommendation to "buy" doesn't violate SOW 4 because SOW 4 directed Perficient to make a "build" or "buy" recommendation. Although Ashley contends that the recommendation to buy is really a recommendation to buy Sterling, Ashley points to no language in either document supporting that contention.

Instead, Ashley points out that the slide presentation included references to IBM. Specifically, Perficient identified IBM as a "subject matter expert" in a proposed project governance structure and made suggestions for "IBM engagement." *Id.*, at 49, 51. This is evidence that Perficient was presuming that Ashley would choose to buy Sterling, but it's not evidence of an attempt to persuade Ashley that Sterling was better than another platform.

Ashley's position appears to be that Perficient violated SOW 4 because Perficient wanted Ashley to choose Sterling. That may be the case, but it shouldn't surprise Ashley. Afterall, it was IBM representatives who introduced Ashley to Perficient in the context of discussions about products that IBM could sell to Ashley, including Sterling. Dkt. 112, ¶¶ 50–53. And Ashley alleges that IBM and Perficient made multiple, joint sales pitches to Ashley about Sterling in 2017, before Perficient agreed to make a "platform agnostic" recommendation. Dkt. 88, ¶¶ 56–57, 78.

A secret (or not-so-secret) wish for Ashley to buy Sterling would not violate SOW 4. Ashley's view seems to be that SOW 4 prohibited Perficient from having its own preference, but that's not what SOW 4 says. Rather, SOW 4 required Perficient to make a "platform agnostic" recommendation for Ashley to buy and customize existing software or develop its own order management system.  Ashley doesn't point to any document or testimony in which

8

Perficient attempted to persuade Ashley that Sterling was preferable to another platform. So Ashley's claim fails on the facts.

In hindsight, Ashley may believe that Perficient should have provided not just a platform agnostic recommendation to build or buy, but also an "objective," side-by-side comparison of the different software options that it could buy. But that isn't what SOW 4 required. If that's what Ashley wanted after getting a recommendation to buy, then that's what it should have asked for. Ashley raised no objections to Ashley's "buy" recommendation and instead proceeded to the next stage of development with the understanding that Perficient would customize Sterling for Ashley. Perficient is entitled to summary judgment on this claim.

## 2. SOW 5

In July 2018, the parties entered into SOW 5, which focused on designing the order management system. Dkt. 54-6. One of the documents that Perficient promised to deliver was called the solution definition document. Neither side describes the document in detail, but it's undisputed that Perficient provided the document to Ashley in August 2018. Dkt. 111, ¶ 13 and Dkt. 112, ¶ 150.  Ashley contends that the document violated SOW 5 because Perficient didn't follow industry standards when creating the document. Specifically, Ashley says that Perficient's "proposed solution to meet Ashley's need for reallocation—Item Based Allocation ('IBA'), a[] . . . feature in Sterling—was not and could never have been the right software solution for Ashley . . . because IBA does not consider customer priority (the primary reason why Ashley needed to reallocate orders)." Dkt. 83, at 62.[10]

---

[10] Ashley also says that Perficient violated SOW 5 because the solution definition document "hid numerous pages of margin comments between Perficient and Ashley." Dkt. 83, at 61. Ashley doesn't explain how that alleged conduct would violate SOW 5, so that argument is forfeited. But even if hiding comments would be a breach of contract, Ashley hasn't adduced

Perficient asserts three grounds for summary judgment on this claim: (1) Ashley forfeited any breach by accepting the solution definition document; (2) neither the SOW nor the master agreement required Perficient to use "industry standards" in creating the document; and (3) Ashley hasn't identified an industry standard that Perficient failed to follow. The court agrees with each of these contentions.

As for Ashley's acceptance of the solution definition document, Perficient cites § 5(f) of the parties' master agreement, which states that Ashley's "failure to provide notification of Acceptance or rejection within ten (10) business days (or such other period as set forth in the applicable SOW) will be deemed an Acceptance of the applicable Deliverable by the parties." Perficient also cites § 10(b)(v), which gives Ashley 30 days from acceptance to ask Perficient to cure any deficiencies.

Perficient says that Ashley affirmatively accepted Perficient's work on SOW 5 because all 24 Ashley employees listed under the "document sign off" section indicated on the solution definition document that it "accurately reflects Ashley's order fulfillment needs for Phase 1 of the Ashley OMS implementation." Dkt. 89-25, at 157–58. Ashley points to a different section of the document that lists 17 "document review assignments." *Id.* at 6–7. Under the column for "sign off," only two of the assignments are identified as "approved." *Id.* Following that section is a section called "Open Issues on Completion of SDD" that includes 10 questions and

---

evidence that Perficient *did* hide any margin comments. Ashley relies solely on testimony from Surajit Mukherjee, Perficient's Solution Architect. But Mukherjee's testimony is only that the margin comments were missing from the printed version of the document that was used as a deposition exhibit. He did not admit or suggest that Perficient hid the comments from Ashley. Rather, he said that the electronic version of the document would have included the comments, and he denied that Perficient deleted any comments. Dkt. 60, at 239:1–22. Ashley cites no evidence undermining Mukherjee's testimony.

comments for further discussion. *Id.* at 7. Ashley says that Perficient should have obtained "clear assent from Ashley" before moving forward. Dkt. 83, at 62.

The court need not decide whether Ashley gave its "clear assent" to the solution definition document because the parties' agreement didn't require that. Rather, § 5(f) of the master agreement required Ashley to clearly *reject* the document or else it would be deemed accepted. Ashley simply ignores that provision of the agreement. It points to no evidence that it ever rejected the solution definition document.

As for whether any of the parties' agreements required Perficient to follow "industry standards," Ashley relies on the definition of "services" in the master agreement:

> "Services" mean (i) any professional or other services to be provided by Vendor under this Agreement, as described in more detail in the applicable Statement of Work; (ii) any industry-standard services, functions or responsibilities not specifically described in this Agreement or in a Statement of Work but that are reasonably required for the proper performance and provision of the Services or Deliverables, or are an inherent part of or necessary sub-task that would be reasonably required to be included within the Services or Deliverables; and (iii) Vendor's obligations under this Agreement as set forth in the applicable SOW.

Dkt. 54-3, at 3. Ashley doesn't explain in its brief how this definition supports a claim for breach of contract, *see* Dkt. 83, at 62, suggesting that Ashley forfeited the argument. Presumably, Ashley is relying on part (ii) of the definition (stating that "services" includes "industry-standard services . . . that are reasonably required for the proper performance and provision of the Services or Deliverables"), along with § 2(a) of the master agreement, which states that Perficient "shall provide the Services" to Ashley.

These provisions are not reasonably interpreted as a warranty that Perficient's work will meet a certain standard. Part (ii) of the definition must be read in conjunction with parts (i)

and (iii), *see Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y. 2003), and those other parts require Ashley to provide the services expressly identified in the SOWs. This makes it clear that part (ii) is a promise to provide services that are standard in the industry, even if those services are not expressly required by an SOW. Part (ii) is not about the quality of services.[11]

Even if the agreement did require Perficient to follow "industry standards" when performing services, this claim fails because Ashley fails to identify in its brief any industry standards that Perficient violated. Contending that Perficient made the wrong choice about how "to meet Ashley's need for reallocation" doesn't show that Perficient violated any particular industry standard. Perficient is entitled to summary judgment on this claim.[12]

**3. SOW 7**

In September 2018, the parties entered into SOW 7, which was about implementing the design from SOW 5. Dkt. 54-8. The parties also modified SOW 7 between 2019 and 2021 through five Change Orders. In contending that Perficient violated SOW 7, Ashley cites the "Project Description," which states that "Phase I implementation will include . . . implementation of core [business-to-business] functionalities as listed in the 'Scope Details'

---

[11] The warranties section of the master agreement includes a provision that Perficient "shall perform the Services using personnel of required skill, experience, and qualifications and in a professional and workmanlike manner in accordance with best industry standards for similar services." Dkt. 54-3, § 10(b)(i). It isn't clear whether this provision is simply about the quality of Perficient's employees or is also a warranty about quality of service. Regardless, Ashley doesn't rely on this provision in the argument in its brief about SOW 5, so any argument under § 10(b)(i) is forfeited.

[12] Ashley repeats its argument about failing to meet "industry standards" in the context of SOW 7, Dkt. 83, at 63, and that argument fails for the same reasons as its argument under SOW 5.

section." *Id.* at 2. Ashley contends that the "Scope Details" section included the following requirements that Perficient didn't provide related to core functionalities:

> end-to-end transparency into the customer order process, taking into account WMS, TMS, and customer capacity and priority levels; a consolidated ATP calculation; scheduling and allocation for optimal order fulfillment based on customer priority and other factors; rules for allocating and reallocating customer orders based on customer priority (and other factors); item based allocation to reallocate uncommitted and committed demands for items of existing orders to more suitable supplies based on user configured criteria like order and customer priority; integration between Sterling and various Ashley legacy systems; and development of a Call Center that was fully integrated with the new OMS and capable of handling all of Ashley's B2B orders.

Dkt. 83, at 63 (footnote omitted). Later in its brief, Ashley says that proper "sizing" was part of the "Scope Details" and that Perficient failed to achieve that. *Id.* at 66. Ashley also contends that Perficient didn't comply with requirements in the master agreement for conducting quality-assurance testing.

Perficient's primary response to these arguments is that it provided Ashley with the deliverables for SOW 7, and Ashley forfeited any claim based on the quality of the deliverables by failing to raise a timely objection as required by § 5(f) of the master agreement. *See* Dkt. 113, at 17–20.[13] But Perficient has not shown that it is entitled to judgment as a matter of law on this issue, for two reasons.

First, Perficient doesn't say in its brief or proposed findings of fact *when* it provided the SOW 7 deliverables, so it isn't clear when Ashley was required to act. In fact, Perficient

---

[13] Perficient also includes two sentences in its opening brief in which it says that "test environments were provided" and that the "project, including addressing bugs, progressed as expected." Dkt. 55, at 22. Perficient doesn't explain how either of these conclusory statements show that it complied with SOW 7, so the court declines to consider them.

acknowledges that it was still in the middle of performing change orders to SOW 7 when Ashley sent Perficient the June 2021 letter complaining about Perficient's performance. Dkt. 111, ¶ 17. And Perficient doesn't contend that Ashley's letter would be insufficient to satisfy Ashley's duty to object under § 5(f). Ashley identifies multiple issues in the letter and generally objects that "Perficient's core configuration of the IBM Sterling OMS delivery system is wrong." Dkt. 54-56.

Second, Perficient doesn't address multiple provisions in § 5 of the master agreement that affect the dates of delivery and acceptance. For example, § 5(g) of the master agreement states that "'Acceptance' of each Deliverable [is] subject, where applicable, to [Ashley's] right to Integration Testing." Dkt. 54-3, at 8.[14] Perficient doesn't contend that testing had concluded by June 2021. Also, under § 5(d), "If [tests conducted by Ashley] identify any non-conformities, errors or failures, [Perficient] shall remedy all such non-conformities, errors, and failures *and shall re-Deliver the Deliverable(s)*." *Id*. (emphasis added). This provision supports an argument that once Ashley identified a problem revealed by testing, Ashley's deadline for accepting or rejecting doesn't expire until Perficient corrects the problem. It's undisputed that Ashley sent Perficient multiple testing reports from IBM in 2020 and 2021 identifying problems with Perficient's work.[15] The facts are simply too unclear and Perficient's argument

---

[14] The master agreement defines "Integration Testing" as testing by Perficient "to ensure full operability, integration and compatibility among all elements" in the SOW. Dkt. 54-3, §§ 1, 5(c).

[15] Perficient objects to the admissibility of IBM's reports as hearsay. But even it is assumed that Ashley is offering the reports for their truth (rather than as evidence that Perficient had notice of Ashley's objection) and that the reports would not qualify as business records under Federal Rule of Evidence 803(6), Perficient identifies no reason why an appropriate witness from IBM couldn't provide testimony consistent with the report at trial. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("[T]he Federal Rules of Civil Procedure allow parties to

is too undeveloped at this point to conclude as a matter of law that Perficient complied with SOW 7 and § 5 of the master agreement.

Perficient also says that Ashley forfeited any claim by failing in its June 2021 letter to give Perficient an opportunity to cure any defects before terminating the contract, as required by § 10(b)(5) of the master agreement. But Ashley's letter asked for a meeting "to discuss an appropriate resolution of this matter," including "Perficient's redoubled and best efforts to assist us in rescuing this implementation." Dkt. 54-56. Perficient doesn't explain why the letter fails to satisfy § 10(b)(5). Perficient says in a footnote in its reply brief that it called Ashley to discuss the letter, Dkt. 113, at 19 n.7, but Perficient doesn't say that it took any steps to correct any deficiencies. So it is reasonable to infer that Perficient had an opportunity to cure but failed to take advantage of that opportunity. The court will deny Perficient's summary judgment motion on this claim.

### 4. Damages

Perficient seeks summary judgment on four types of damages claimed by Ashley: (1) service fees; (2) labor costs; (3) licensing fees for IBM Sterling; and (4) attorney fees. Perficient also contends that the master agreement limits Ashley's total damages to $16,435,396, which is double the amount Ashley paid to Perficient. Ashley doesn't respond to Perficient's arguments on attorney fees or the damage cap, so the court will grant summary judgment to Perficient on those issues. The remaining three disputes are discussed below.

---

oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form.").

### a. Service fees

Ashley seeks service fees of approximately $8 million that it paid to Perficient under SOWs 4, 5, and 7. Perficient contends that Ashley isn't entitled to any of those fees because Ashley didn't connect them to a defect in a particular deliverable but instead seeks reimbursement for all fees charged for each SOW.

The court is granting summary judgment to Perficient on Ashley's claims under SOW 4 and SOW 5, so Ashley may not seek damages for those alleged breaches. As for the fees charged for SOW 7, Ashley's position is that it is entitled to a full refund of those fees because SOW 7 was a complete failure. Perficient doesn't identify any specific benefit that Ashley obtained from any of Perficient's work on SOW 7, so the court will deny summary judgment on that category of damages.

### b. Labor costs

Ashley seeks approximately $5 million for its own labor costs it devoted to the project. Perficient contends that labor costs are consequential damages, which are barred by § 12(a) of the master agreement. In response, Ashley cites § 12(b)(iv), which creates an exception to § 12(a) for damages caused by "a party's gross negligence, willful misconduct or intentional acts." New York law defines "gross negligence" to mean "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v Jewelers Protection Services, Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993). Ashley cites two examples of alleged willful or reckless misconduct by Perficient: (1) "procuring Ashley's assent to SOW 4 though deception"; and (2) continuing with the project after April 2020, when Surajit Mukherjee, Perficient's Solution Architect, concluded that "Sterling would not work for Ashley." Dkt, 83, at 74.

16

Neither instance of alleged misconduct creates a genuine dispute over whether § 12(b)(iv) applies. The court is granting summary judgment to Perficient on Ashley's claim under SOW 4, so any alleged misconduct related to that SOW cannot provide the basis for consequential damages.

As for Perficient's decision to continue with the project after April 2020, the testimony that Ashley cites from Mukherjee doesn't support Ashley's allegations. Rather, Mukherjee repeatedly stated that Perficient told Ashley that some of its requirements were incompatible with Sterling. Dkt. 60, at 268:13–269:19 (incompatibility issues were "highlighted to Ashley all the time that if there is a requirement that came up that cannot be achieved with the product, it was highlighted immediately saying, we have to stop and think here whether we want to change the process"); *id.* at 273:21–274:3 (Perficient told Ashley that "Sterling is not able to" do what Ashley was asking regarding reallocation); *id.* at 274:9–23 ("[W]e started saying that this cannot be done . . . . Perficient is saying it cannot be done."). Ashley cites no contrary evidence. Under these circumstances, it would not be willful misconduct or gross conduct to continue as Ashley directed. So the court will grant summary judgment to Perficient on this category of damanges.

### c.  IBM licensing fees

Ashley seeks approximately $3 million in licensing fees it paid to use IMB Sterling. Perficient's argument on this issue consists of one, short paragraph in which Perficient makes a conclusory assertion that Ashley obtained benefits from the license, without citing evidence. Ashley denies that it obtained any benefit from the license, so the court will deny summary judgment on this issue.

**B. Perficient's breach-of-contract counterclaim**

Perficient contends that Ashley breached the master agreement by failing to pay more than $1 million in invoices related to SOW 7. But Perficient acknowledges that its claim is contingent on a finding that it did not breach SOW 7. The court is denying summary judgment to Perficient on Ashley's claim under SOW 7, so it would be premature to decide Perficient's counterclaim, and the court will deny Perficient's summary judgment motion as to the counterclaim.

ORDER

IT IS ORDERED that Perficient, Inc.'s motion for summary judgment, Dkt. 52, is GRANTED in part and DENIED in part. It is DENIED on the following claims and issues: (1) Ashley Furniture Industries, LLC's claim that Perficient breached Statement of Work 7 and § 5 of the Master Services Professional Agreement by failing to conduct proper testing and provide Ashley with a working order management system; (2) Perficient's counterclaim; (3) damages for service fees paid on SOW 7; and (4) damages for IBM licensing fees. The motion is GRANTED in all other respects.

Entered April 25, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

18